UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVRA BOMMARITO, an individual,<br><br>        Plaintiff,<br><br>   v.<br><br>THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY and MARK MAJEWSKI,<br><br>        Defendants. | NO. 2:15-cv- 1187 WBS DB<br><br>MEMORANDUM AND ORDER RE: MOTION FOR THE APPLICATION OF ERISA AND MOTION FOR PARTIAL SUMMARY JUDGMENT OR SUMMARY ADJUDICATION |

        Plaintiff Devra Bommarito initiated this action against defendants The Northwestern Mutual Life Insurance Company ("Northwestern Mutual") and Mark Majewski for breach of contract, breach of good faith and fair dealing, and declaratory relief. Presently before the court is Northwestern Mutual's Motion for the Application of ERISA to this Matter and its Motion for Partial Summary Judgment and/or Summary Adjudication on plaintiff's bad faith and punitive damage claims. (Docket No. 36.)

I.   <u>Factual and Procedural Background</u>

1

From May 1992 until December 2010, plaintiff was a physical therapist and 50% owner of XCEL Orthopaedic Physical Therapy, Inc. ("XCEL"), at which time she became the sole owner of XCEL. (Decl. of Rebecca Grey ("Grey Decl.") (Docket No. 51-3), Ex. 7.) On September 7, 1997, plaintiff purchased a Disability Income Policy ("the Bommarito Policy") from Northwestern Mutual. (Decl. of Lisa Duller ("Duller Decl.") (Docket No. 36-5), Ex. 25 at 18.) In the event of plaintiff's inability to engage in her "regular occupation," the policy provided monthly benefits until plaintiff's 70th birthday. (Grey Decl., Ex. 8.)

Plaintiff's former business partner, G.B.,[1] also purchased a disability insurance policy from Northwestern Mutual at this time. Additionally, Northwestern Mutual agent Steve Field ("Field") met with plaintiff and G.B. at XCEL's office several times. (Decl. of Sean P. Nalty ("Nalty Decl.") (Docket No. 36-3), Ex. 35 (Plaintiff's Dep.).) Plaintiff also allowed Field to meet with XCEL employees to discuss Northwestern Mutual's services, including its disability insurance. (Id.)

Beginning on December 31, 2006, plaintiff was involved in multiple events causing injuries to her cervical spine and left shoulder. (Id.) On or about November 24, 2009, plaintiff submitted a Request for Disability Benefits to Northwestern Mutual. (Decl. of Lisa Duller ("Duller Decl.") (Docket No. 36-5) ¶ 4.) In January 2010, the claim was approved. (Id.) At the time, the date of disability was established as September 27,

---

[1] Initials of XCEL employees will be used throughout this order.

2

2007. (Id.)

Plaintiff received partial disability benefits for the time between December 26, 2007 and December 9, 2009. (Duller Decl. ¶ 4.) At that point, plaintiff had surgery. Thereafter, until August 26, 2013, she received total disability benefits from Northwestern Mutual under the Bommarito Policy. (Id. ¶ 5.) During this time, plaintiff represented to Northwestern Mutual on numerous occasions that she was not working at all. For example, on the Continuance of Disability Benefits Form that plaintiff signed on May 21, 2010, she answered "no" to the question of whether she had performed "any work of any kind at your prior occupation or at any other occupation whether or not you received any income." (Nalty Decl., Ex. 31 (Northwestern Mutual's First Set of Req. for Admissions), Req. 20.) When filing out the same form in August 2010, August 2011, November 2011, June 2012, December 2010, and October 2013, plaintiff repeatedly answered no to this question. (Id.)

Defendant also required plaintiff to apply for Social Security Disability Income benefits. (Grey Decl., Ex. 3 (Majewski Dep.).) Accordingly, plaintiff submitted an application to the Social Security Administration. On May 5, 2011, Northwestern Mutual informed plaintiff that the Social Security Administration had denied her application for benefits, and instructed her to appeal the decision. On August 9, 2012, plaintiff submitted to the Social Security Administration a Disability Report Appeal, in which she stated that she had not worked between February 27, 2012, and August 9, 2012. (Nalty Decl., Ex. 33 (Northwestern Mutual Second Set of Req. for

3

Admissions), Req. 33).) On November 1, 2013, Northwestern Mutual informed plaintiff that she had been awarded Social Security Disability Income Benefits. She was told that, as a result of this, her Northwestern Mutual benefits would be impacted. In addition, plaintiff was told she would need to reimburse Northwestern Mutual for an overpayment of benefits from November 1, 2009 to July 26, 2013 in the amount of $46,639.99.

On May 8, 2013, Northwestern Mutual was contacted by the California Department of Consumer Affairs and was told that plaintiff "was practicing physical therapy while receiving private disability insurance benefits." (Grey Decl., Ex. 8.) Because of this, Northwestern Mutual placed plaintiff under surveillance. (Declaration of Adam Kawa ("Kawa Decl.") ¶¶ 4-5, Exs. 16-20.)

On January 17, 2014, Northwestern Mutual sent a letter to plaintiff accusing her of intentionally misrepresenting her level of functioning, and informing her of its determination that she was neither partially nor totally disabled. (Grey Decl., Ex. 1.) Plaintiff's claim file was closed and the policy was canceled. On February 11, 2014, defendant filed a fraud report with the California Department of Insurance, alleging that "the insured intentionally provided false and misleading information regarding her condition in order to fraudulently obtain benefits from Northwestern Mutual." (Grey Decl., Ex. 8.) On February 22, 2016, the San Joaquin County District Attorney filed a criminal complaint against plaintiff, charging her with multiple counts of Fraudulent Claim for Insurance Payment, among other things. (Nalty Decl., Ex. 36 (Compl. in The People of the State of

1  California, Plaintiff, v. Devra Ann Bommarito, San Joaquin County
2  Superior Court, DA Case: CR-2016-4112271).)
3       Plaintiff initiated this lawsuit on June 1, 2016,
4  alleging breach of contract, breach of the implied obligation of
5  good faith and fair dealing, and seeking declaratory relief.
6  (Compl. (Docket No. 2).)  On March 2, 2018, plaintiff filed a
7  Motion for Disqualification of Counsel as well as a Motion to
8  Strike Defendants' Motion for Summary Judgment.  (Docket No. 40.)
9  The court denied both motions on March 12, 2018.  (Docket No.
10 46.)

II. <u>Motion for the Application of ERISA</u>

Northwestern Mutual contends that plaintiff's state-law claims are preempted by ERISA. ERISA's preemption clause, 29 U.S.C. § 1144(a), states that ERISA provisions "shall supersede . . . State laws" to the extent those laws "relate to employee benefit plans." In this case, whether ERISA preempts plaintiff's state-law claims requires examination of whether the Bommarito Policy constitutes part of an "employee benefit plan" such that it would be governed by ERISA.

Under ERISA § 3(1), 29 U.S.C. § 1002(1), an "employee welfare benefit plan" or "welfare plan" is:

> (1) a plan, fund or program (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits . . . (5) to the participants or their beneficiaries.

<u>Kanne v. Connecticut Gen. Life Ins. Co.</u>, 867 F.2d 489, 492 (9th Cir. 1989)(citing <u>Donovan v. Dillingham</u>, 688 F.2d 1367, 1371 (11th Cir. 1982)).

The existence of an ERISA plan is a question of fact for the court, to be answered in light of all surrounding facts and circumstances. (Id.) The existence of an ERISA plan must be established by a preponderance of the evidence. (Id.)

A. Plan, Fund, or Program

Defendant argues that plaintiff and her XCEL co-owner G.B. set up a plan to provide employees with disability coverage. Plaintiff argues, conversely, that she did not intend to set up any such plan, and instead merely purchased an individual disability policy for herself. "In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." Cinelli v. Security Pacific Corp., 61 F.3d 1436, 1441 (9th Cir. 1995) (citing Donovan, 688 F.2d at 1373).

No single act alone is sufficient to constitute the establishment of a plan, fund, or program. For example, "the purchase of insurance does not conclusively establish a plan, fund, or program, but the purchase is evidence of the establishment of a plan, fund, or program." Donovan, 688 F.2d at 1373 (cited with approval in Cinelli, 61 F.3d at 1441-42). Further, "the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." (Id.)

The disability policy issued to plaintiff has a date of issue of August 7, 1997. (Duller Decl., Ex. 25.) The application, which was signed by plaintiff, indicated that the

premium would be paid "100% by employer," and noted that "an ERISA Disclosure Statement . . . is required whenever the employer is paying any part of the premium." (Seebach Decl. (Docket No. 36-8), Ex. 1 at 11.) An ERISA disclosure was in fact submitted. In addition, plaintiff signed and submitted Employer Statements which explained that "all employees" were in the class of employees that were eligible for this coverage. (Id. at 12.) The form further explained that XCEL would "demonstrate employer sponsorship" by, among other things, paying all or part of the premium, using payroll deduction, recommending the program to eligible employees through an endorsement letter, and allowing Northwestern Mutual agents to contact eligible employees on company time. (Id.)

Furthermore, between 1998 and 2002, XCEL employees B.B., M.K., J.O., C.H., M.C., G.L., L.E., J.S., and B.E. all applied for disability insurance from Northwestern Mutual. (Seebach Decl., Exs. 1-11.) The employees' applications were submitted with documents explaining that the premiums would be paid 100% by employer XCEL. (Id.) ERISA Disclosure were also submitted with each application.

This evidence establishes that disability insurance policies were issued by Northwestern Mutual to nine XCEL employees. Clearly, the intended benefit was to provide disability coverage to said employees. It is equally clear from the record that the persons benefitting are employees who applied for and qualified for disability coverage. The disability benefits were financed through the policies issued by Northwestern Mutual, and the procedures to apply for and collect

7

benefits are specified in each of the Policies.  Accordingly, the court concludes that although this plan was accomplished through the issuance of a number of individual insurance policies, a plan was created because "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.'" Carver v. Westinghouse Hanford Co., 951 F.2d 1083, 1087 (9th Cir. 1991) (citing Donovan, 688 F.2d at 1373).  Thus, defendant has satisfied the first element.

B. Established or Maintained by an Employer

The Ninth Circuit has recognized than an employer "can establish an ERISA plan rather easily.  Even if an employer does no more than arrange for a 'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees." Credit Managers Ass'n. v. Kennesaw Life & Acc. Ins. Co., 809 F.2d 617, 625 (9th Cir. 1987).

The evidence discussed in the previous section demonstrates that XCEL "established or maintained" a disability benefit plan.  As explained, plaintiff signed Employer Statements that indicated that XCEL would demonstrate "employer sponsorship" by performing tasks that constitute endorsement of the Policies and the XCEL Plan.  Furthermore, the signed forms indicated that XCEL would contribute 100% of premium costs.  Accordingly, the court concludes that XCEL established and maintained a benefit plan.

C. Remaining Requirements

The third, fourth, and fifth requirements are easily

8

satisfied in this case. The plan must be provided by an employer, for the purpose of providing benefits, to participants or their beneficiaries. ERISA defines an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5). XCEL clearly is an employer. The XCEL Plan was established to provide health, disability, and dental insurance, thereby satisfying the fourth requirement. Finally, the fifth requirement is satisfied because the Plan provided these benefits to all Plan participants, including plaintiff, as well as at least eight other XCEL employees who enrolled in and received disability insurance. Therefore, the court concludes that an ERISA Plan was established.

    D.    <u>ERISA Exemptions</u>

        Plaintiff argues that even if an ERISA Plan was established, her policy is exempt from ERISA because of the Safe Harbor Provision created by 29 C.F.R. § 2510.3-1(j). The Safe Harbor exempts insurance policies from ERISA where (1) there are no employer contributions to coverage, (2) participation is completely voluntary, (3) the employer does not endorse the program, and (4) the employer receives no consideration for the program. 29 C.F.R. § 2510.3-1(j). For plaintiff to prevail on this point, she would need to prove that the plan meets all four requirements of the regulation. 29 C.F.R. 2510.3-1(j); <u>Sgro v. Danone Waters of N. America, Inc.</u>, 532 F. 3d 940, 942 (9th Cir. 2008) (court determined plan was not exempt from ERISA because plaintiff failed to allege that employer had made no contribution to the plan).

1. Contributions and Payment

The parties dispute whether XCEL contributed to its employees' disability insurance policies. Plaintiff argues that XCEL never paid the policy premiums for employees, while defendant argues the opposite. However, XCEL need not have paid for the premiums in order to have contributed to the coverage. By facilitating discounted premiums through a multi-life premium discount, XCEL "contributed" to the program, regardless of whether it actually paid for the premiums or not.

Plaintiff's Disability Insurance Application indicated that she would apply for a "MultiLife" Plan, which would provide a Multilife Discount. (Seebach Decl., Ex. 1 at 3.) A MultiLife Discount Supplement was submitted with plaintiff's application, along with all XCEL employee applications. According to numerous California courts, a discount on an insurance policy premium constitutes an employer contribution. Zide v. Provident Life & Acc. Ins. Co., No. SACV 10-393 JVS, 2011 WL 12566818, at *7-8 (C.D. Cal. Apr. 13, 2011) (collecting cases). When "the employee receive[s] a benefit they would not have absent the action taken by their employers, [the] employer's action should be considered a 'contribution.'" (Id.) Thus, because plaintiff facilitated a discounted rate for employees, she contributed to the plan, regardless of who paid the premiums directly.

Plaintiff argues that even according to Seebach, a Northwestern Mutual employee, there is nothing in the record explicitly indicating that plaintiff and G.B. were made aware that a Multilife Supplement was submitted with their employees' applications. (Grey Decl., Ex. 6, (Seebach Dep.) at 167.)

However, even if plaintiff did not fill out the form herself, as she argues, she still signed it, and thus the court expects that she would have an awareness and understanding of the information contained within. Thus, whether there is anything in the record to explicitly indicate that plaintiff was informed that these forms would be submitted with each application is irrelevant. Her signature appears on each of them, and that is sufficient for the court to determine that she was aware of the Multilife Supplements and the Multilife Discounts.

Accordingly, the court concludes that XCEL contributed to its employees' coverage, and thus plaintiff cannot satisfy the first requirement. Because all factors of the safe harbor provision must be met, the court does not consider the remaining factors and instead concludes that the safe harbor provision does not exclude the plan at issue here from ERISA coverage. See Stuart v. UNUM Life Ins. Co. of America, 217 F.3d 1145, 1153 (9th Cir. 2000) (noting that "employers must satisfy all four requirements of the safe harbor regulation . . . to be exempt from ERISA coverage").

E. Plaintiff's Claims are Governed by ERISA and State Law Claims are Preempted

The Ninth Circuit has continually held that state law claims arising out of a denial of ERISA plan benefits are preempted by ERISA. See, e.g., Cleghorn v. Blue Shield of California, 408 F.3d 1222 (9th Cir. 2005). In this case, plaintiff's Complaint is based on state law claims alleging that

Northwestern Mutual breached the terms of the Bommarito Policy and improperly processed plaintiff's claim for disability benefits. Because this is an ERISA governed plan, ERISA provides plaintiff with a specific and express cause of action for recovering such benefits. Accordingly, plaintiff's claims for relief for breach of contract, bad faith, and declaratory relief must be dismissed, with prejudice, because they are preempted by ERISA.

III. <u>Motion for Partial Summary Judgment and/or Summary Adjudication of the Bad Faith and Punitive Damages Claims</u>

Defendant moves for summary judgment or summary adjudication on plaintiff's claims for Bad Faith and Punitive Damages, arguing that these claims fail as a matter of law.

A. <u>Bad Faith Claim</u>

"The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable. Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." <u>Guebara v. Allstate Ins. Co.</u>, 237 F.3d 987, 992 (9th Cir. 2001). "The Ninth Circuit has frequently affirmed summary judgment orders in bad faith claims where the trial court's ruling was based on a genuine dispute over insurance coverage." <u>Adams v. Allstate Ins. Co.</u>, 187 F. Supp. 2d 1207, 1214 (C.D. Cal. 2002).

In this case, the record indicates that there was a genuine dispute as to whether plaintiff should have received disability insurance benefits and thus that Northwestern Mutual's

12

denial was reasonable.  Despite plaintiff's multiple representations that she was performing no work of any kind, when questioned by defense counsel, plaintiff admitted that she had provided physical therapy services to patients "at times" and that she worked as a physical therapist "intermittently, on an as-needed, emergency basis" from 2010 forward.  (Nalty Decl., Ex. 5 (Plaintiff's Dep.).)

In addition, Dr. Bryan Coleman Salgado ("Dr. Salgado"), who works as an expert consultant for the California Department of Consumer Affairs, reviewed XCEL's records and identified 125 patients that had received treatment from plaintiff between 2010 and 2013.  (Decl. of Bryan Coleman Salgado ("Salgado Decl.") (Docket No. 36-7) Delgado Decl., Ex. 12.)  Northwestern Mutual asked physician consultant Henry M. Alba ("Dr. Alba") to review plaintiff's claim for disability benefits.  (Declaration of Henry M. Alba ("Alba Decl.") (Docket No. 36-4).)  Dr. Alba reviewed the video surveillance, medical records, and pharmacy records.  Dr. Alba concluded that plaintiff "is clearly working fulltime.  Therefore there is no limitations nor restrictions for her occupational duties as an owner/operator of a physical therapy clinic."  (Id. ¶ 4, Ex. 23.)  From this, Northwestern Mutual reached the conclusion that plaintiff had been "intentionally misrepresenting [her] level of functioning to obtain benefits that [she] knew [she was] not entitled to."  (Nalty Decl., Ex. 38 (Hyde Dep.).)

Despite plaintiff's assertion that she was not working at all, the evidence indicates otherwise.  These alleged misrepresentations by plaintiff, which were serious enough to

13

result in a criminal prosecution,[2] certainly establish that Northwestern Mutual had a reasonable and just cause for the denial of the claim. Accordingly, the court concludes that Northwestern Mutual did not act in bad faith in denying plaintiff's benefits. The court makes no decision as to whether Northwestern Mutual's decision was correct, but instead merely concludes that there was a genuine dispute as to coverage. Accordingly, the court will grant summary judgment in favor of Northwestern Mutual as to plaintiff's claim of bad faith.

B. Punitive Damages Claim

"Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages." Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1287 (4th Dist. 1994). The court can summarily adjudicate plaintiff's punitive damage claim if "no rational jury could find the Plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." Hoch v. Allied-Signal, Inc., 24 Cal. App. 4th 48, 58-61 (1st Dist. 1998).

The evidence relied on by Northwestern Mutual establishes, at the very least, that there is at least a genuine dispute over the existence of a disability. The dispute was so great, in fact, that it led to criminal charges against plaintiff for alleged fraud related to her benefits plan. Thus, Northwestern Mutual's denial of benefits was reasonable, and

---

[2] The criminal trial has been continued until September 4, 2018. (Docket No. 47.)

14

plaintiff cannot present clear and convincing evidence of malice, oppression, or fraud.  Accordingly, plaintiff's punitive damages claim must be dismissed with prejudice.

IT IS HEREBY ORDERED that defendant's Motion for the Application of ERISA and its Motion for Summary Judgment of plaintiff's Claim for Relief for Bad Faith and Claim for Punitive Damages (Docket No. 36) be, and the same hereby are, GRANTED.

Dated: July 23, 2018

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE